UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| DOUGLAS CRAIN, ET AL. | CASE NO. 5:18-CV-00548 |
| VERSUS | JUDGE ELIZABETH ERNY FOOTE |
| E&M OPERATING, L.L.C., ET AL. | MAGISTRATE JUDGE HORNSBY |

## MEMORANDUM RULING

Now pending before the Court is a Motion for Default Judgment filed by Douglas and Catherine Crain ("Plaintiffs") against the Defendants, E&M Operating, L.L.C. ("E&M") and Coleman Matthew Caldwell ("Caldwell"). [Record Document 15]. For the reasons discussed below, Plaintiffs' Motion for Default Judgment is **DENIED**.

The Court gives Plaintiffs leave to re-urge this motion once they have amended it to include, at a minimum, the information referenced below. Plaintiffs' deadline to re-urge this motion is **Monday, April 1, 2019**. The failure to re-urge the motion by that deadline will result in the dismissal of this case.

## BACKGROUND

Plaintiffs are a married couple who claim to have invested a total of $28,500 with E&M, an oil and gas company, after being induced to do so by Caldwell. Record Document 15-2, p. 4. According to Plaintiffs, Caldwell professed to be the owner of E&M and induced Plaintiffs to purchase twenty-five "notes"[1] issued by E&M by falsely claiming that this

---

[1] As is discussed in more detail below, it is not clear what is meant by "notes" as the word is used in this case. There are no promissory notes in the record.

1

investment would result in a return of 200% plus an additional 12% per annum for a three-year period. Record Document 1, ¶s 9–12. Plaintiffs purchased these "notes," which they claim are securities under federal and state law, for $25,000 in May of 2016. *Id.* at ¶s 11 & 14. Defendants advised Plaintiffs in June of 2016 that they would receive a 5% share membership in E&M and that their two adult children would each receive a 1% share membership in E&M. *Id.* at ¶s 16–17. These share memberships were accompanied by "Membership Certificates," which Plaintiffs claim were used to further induce them to trust Defendants and to purchase additional "notes" for a sum of $750.00. *Id.* at ¶s 18–20. Defendants told Plaintiffs that E&M's remaining membership and shares were being acquired by Striper Oil Company. *Id.* at ¶ 21. Plaintiffs allege they have since spoken with Sam Smith ("Smith"), the owner of Striper Oil Company, who stated that his company had no relationship with Defendants and was not acquiring any interests in E&M. *Id.* at ¶ 24. Defendants ceased communications with Plaintiffs in late 2017 even though Plaintiffs have tried repeatedly to reach them since that time. *Id.* at ¶ 23. Plaintiffs claim that Smith spoke with Defendants who told Smith that they do not intend to pay Plaintiffs' "notes" upon maturity. *Id.* at ¶ 24. Plaintiffs allege that Defendants are in anticipatory breach of their agreement because Defendants have failed to respond to their attempts at contact or acknowledge that the maturity date on the "notes" is early May of 2019. *Id.* at ¶ 23. Plaintiffs claim that Caldwell misrepresented the holdings and value of E&M and that he converted the money they invested in E&M to his own personal use. *Id.* at ¶s 25 & 30. Plaintiffs also assert that Defendants have used other identities to sell securities, including "Gulfstream Oil Operating Company." *Id.* at ¶ 29.

Plaintiffs state that Defendants committed "a large number" of frauds and misdeeds in connection with their investment monies, including false material misrepresentations as to the issuance and sale of securities to Plaintiffs, material misrepresentations in the agreement and memorandum with respect to the legitimacy and quality of the securities, issuing false statements in connection with the issuance and sale of securities, mail fraud, conversion of securities and investment monies, fraud, violations of federal securities laws, Louisiana Blue Sky Laws, and the Texas Securities Act, and breaches of the duties of honesty, good faith, loyalty, trust, and fiduciary duties. *Id.* at ¶ 32. Plaintiffs claim that they have sustained a wide variety of economic and non-economic damages. *Id.* at ¶s 33 & 71.

## **LAW AND ANALYSIS**

### I. **Default Judgment Standard**

A default judgment involves three steps: (1) default, (2) entry of default, and (3) default judgment. *N.Y. Life Ins. Co. v. Brown*, 84 F.3d 137, 141 (5th Cir. 1996) (citing Fed. R. Civ. P. 55(a)).

> A default occurs when a defendant has failed to plead or otherwise respond to the complaint within the time required by the Federal Rules. An entry of default is what the clerk enters when the default is established by affidavit or otherwise. After defendant's default has been entered, plaintiff may apply for a judgment based on such default. This is a default judgment.

*Id.* (citations omitted).

By defaulting, a defendant admits to the plaintiff's well-pleaded allegations of fact, at least with respect to liability. *Jackson v. FIE Corp.*, 302 F.3d 515, 525 (5th Cir. 2002) (citing *Nishimatsu Constr. Co., Ltd. v. Hous. Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir.

3

1975)). Even though the facts are admitted, the plaintiff still has the burden of showing that they give rise to a viable cause of action. *See Nishimatsu Constr.*, 515 F.2d at 1206. In addition, a default judgment "must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Fed. R. Civ. P. 54(c).

## II. <u>Application</u>

Plaintiffs move for a default judgment in the total amount of $657,311.78 against Defendants. Record Document 15, p. 3. Plaintiffs break down this total as follows:

| | |
|---|---:|
| Lost Investment Funds: | $ 28,500.00 |
| Expected Returns: | 67,260.00 |
| Out of Pocket Monies: | 700.00 |
| Non-economic Damages: | 65,000.00 |
| Punitive Damages: | 478,800.00 |
| Attorneys' fees, expenses and costs: | 17,051.78 |
| Total Award Sought: | $ 657,311.78 |

Record Document 15, pp. 2–3.

Attached to the motion are three hundred and forty-three pages of exhibits, only one of which is identified with a descriptive label. *See* Record Document 15. The Court finds that the motion is procedurally ripe, that is, that no responsive pleading has been filed by the Defendants and Plaintiffs have requested and obtained an entry of default from the Clerk of Court. Fed. R. Civ. P 55(a); *N.Y. Life Ins. Co.*, 84 F.3d at 141. However, the Court is unable to determine from the record whether any money is due the Plaintiffs and, if so, the appropriate amount. As is explained more fully below, the Court is unsure as to whether this is a suit to collect a debt for money loaned by the Plaintiffs to E&M, a suit against Defendants for fraudulently inducing the Plaintiffs to invest in a bogus

4

company, or a suit against Defendants for a violation of securities law. The motion for default judgment is thus denied for the following reasons.

   a. Absence of "securities" or proof of indebtedness in the record

Plaintiffs do not identify the "securities"[2] or evidence of indebtedness upon which their claim rests. There are three different sets of documents that the Court presumes Plaintiffs are relying upon to prove their claims. The first set of documents, entitled the "Private Placement Subscription Agreement, E&M Operating LLC" [Record Document 15-9] and the "Confidential Private Placement Memorandum, E&M Operating LLC" [Record Document 15-10] seem to be evidence that Plaintiff Doug Crain did in fact "subscribe" to "the offering" by E&M in the amount of $25,000. Although Plaintiffs claim that they invested a total of $28,500, there is no "Private Placement Subscription Agreement, E&M Operating LLC" or "Confidential Private Placement Memorandum, E&M Operating LLC" that records any payments of the additional $3,500. As noted below, there is a type of receipt for an additional $10,000 [Record Document 15-14], which Plaintiffs state they really did not pay, but instead actually paid a discounted amount of $2,500 for ten

---

[2] The Securities and Exchange Act of 1934 defines a "security" as
> any note, stock, treasury stock, security future, security-based swap, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

15 U.S.C. § 78(c)(a)(10); *United States v. Blount*, 906 F.3d 381, 385 (5th Cir. 2018).

5

additional "notes." Record Document 15-3, ¶s 77–79. Plaintiffs contend that they paid another $750 to Defendants, but the record is not clear as to what they received in return nor does it contain any document that could be construed as a receipt or commercial paper in return for this payment. *Id.* at ¶ 37. This first set of documents contains some terms for the investment--which are contradictory in some places--and quite a few disclaimers. *See* Record Documents 15-9 & 15-10. These documents, like the "subscription agreements" discussed below, refer to "notes," but the Court could not locate any promissory notes in the record.

The second set of documents are "subscription agreements" [Record Documents 15-13 & 15-14] but these documents do not contain a maturity date, nor do they constitute evidence of an indebtedness in and of themselves. They appear to be more in the nature of a receipt. As stated above, there are only two subscription agreements, and these do not total the amount that Plaintiffs have line-itemed as their "Lost Investment Funds." *See* Record Documents 15, p. 2, 15-13, & 15-14.

The third set of documents are "membership certificates" in E&M. Record Documents 15-15, 15-16, & 15-17. Plaintiffs describe this granting of an ownership interest in E&M as "an inducement to invest in the notes." Record Document 15-8, p. 1. Were these membership certificates given in exchange for the amounts listed in the "subscription agreements"? The record is unclear. Despite providing the Court with three sets of documents related to their alleged investment, Plaintiffs have failed to provide any evidence of Defendants' indebtedness to them or any documents that meet the definition of a "security." *See* 15 U.S.C. § 78(c)(a)(10).

b. <u>Inconsistencies in the documents provided by Plaintiffs</u>

Not only are there no "securities" or consistent evidence of indebtedness for the amounts of money that Plaintiffs claim they gave Defendants, but the Court cannot determine the actual amount of money that Plaintiffs gave to Defendants--whether as a loan or an investment--nor how Plaintiffs calculate their line item amount for "Expected Returns." For example, as to the amount given by Plaintiffs to Defendants, Record Document 15-13 reflects a $25,000 payment by Plaintiff Doug Crain and Record Document 15-14 reflects a $10,000 payment. This total of $35,000 is not consistent with the $28,500 that Plaintiffs claim that they "invested" or loaned, nor is it consistent with the $25,000 reflected in the "Confidential Private Placement Memorandum, E&M Operating LLC." Record Document 15-10, p. 15.

The Court acknowledges that there are two hundred and forty-nine pages of text messages and Facebook messages between Plaintiff Doug Crain and Caldwell that contain many discussions of buying additional amounts of "stock," buying other people's "notes," and even a donation of "stock" from Caldwell to Plaintiff Doug Crain. *See* Record Documents 15-4, 15-5, 15-6, & 15-7. The Court has no way of knowing whether these referenced transactions actually took place. Doug Crain has submitted an affidavit which explains that he really did not pay $10,000 for an additional ten "notes" as reflected in Record Document 15-14, but instead paid a "discounted" amount of $2,500 for an additional ten "notes." Record Document 15-3, ¶s 77–79. This was a separate transaction from the original $25,000 investment. *See* Record Document 15-3, ¶s 26 & 27. Doug Crain also asserts in his affidavit that he paid Caldwell an additional $750. Record

7

Document 15-3, ¶ 37. However, these three listed transactions of $25,000, $2,500, and $750 total $28,250, and not the $28,500 claimed. *See* Record Document 15, p. 2.

As to the amount of "expected returns," the "Confidential Private Placement Memorandum, E&M Operating LLC" [Record Document 15-10, p. 2] lists interest to be paid monthly at 12% for a period of 36 months[3] with a return at the end of this period of 200% of the amount invested. However, Plaintiffs are asking this Court to award them $67,260 in "expected returns." Doug Crain explains the basis for this request in his affidavit. He states that "they were to earn" 236% of the invested $28,500. Record Document 15-3, ¶ 128. The Court assumes that the 236% represents the 200% return with three years of simple interest at 12% per year.

There are other inconsistencies in Doug Crain's affidavit. At one point he summarizes that he had paid Caldwell $25,750 [Record Document 15-3, ¶ 116] but he states in other places that the amount he paid was $28,500. Record Document 15-3, ¶s 119 & 125. There is an additional reference in the record to the fact that Doug Crain had agreed to go "halves" with Caldwell to buy some "notes" from an "old man" for a total of $2,000, or $1,000 each. Record Document 15-3, ¶ 111. There is no assertion that Doug Crain ever made such a payment, and even if he had, this transaction would not clear up the inconsistencies noted. While these inconsistencies could be attributable to simple typographical or mathematical errors, these discrepancies render the record ambiguous and the Court's job impossible. The Court cannot grant a default judgment where the amount demanded in the pleadings is ambiguous. Fed. R. Civ. P. 54(c). Because the

---

[3] As discussed in more detail below, it is not clear when this 36-month period began to run.

pleadings themselves do not demand an exact amount, the Court must deny Plaintiffs' motion for default judgment.

c. Lack of legal authority

Plaintiffs outline in a general manner some caselaw that opines that an indebtedness owed by a company can sometimes constitute a "security" within the meaning of the security laws cited or that such indebtedness sometimes simply constitutes a loan. *See* Record Document 15-2, pp. 20–24. However, the brief does not direct the Court as to why the specific indebtedness in this case constitutes a "security" as a matter of fact or law. Furthermore, Plaintiffs rely on *both* Texas and Louisiana state law but do not direct the Court as to which state's law should apply or why. Plaintiffs fail to provide the Court with sufficient legal authority to support their claims to relief.

d. Unfounded allegations of "anticipatory breach"

Plaintiffs state that Defendants have "anticipatorily" breached the "agreements" and make reference to the fact that the maturity date of the indebtedness is not until May 10, 2019. Record Document 15-2, pp. 6 & 15. The Court guesses that Plaintiffs are arguing that they were not paid any installments on the paid amounts and that the Plaintiffs' inability to contact Defendants does not bode well for any expected payments. *See id.* at 7. However, the record is ambiguous as to the maturity date of the indebtedness. The "subscription agreements" [Record Documents 15-13 & 15-14] do not contain a maturity date, as noted above. The "Confidential Private Placement Memorandum, E&M Operating LLC" does contain a maturity date but ambiguously states that a 12% annual rate of interest will be "paid monthly beginning the first month after

first well in production for 36 months." Record Document 15-10, p. 3. Plaintiffs have not provided the Court with any information as to whether E&M ever had any wells in production. If no well was ever in production, did the interest and/or the 36-month term ever begin to run? Other language in the same document suggests that the term of the loan is simply 36 months from the date of the investment. *Id.* As noted above, this document also refers to "notes," but the Court could not identify any promissory notes in the record. Plaintiffs' claims of "anticipatory breach" are unsubstantiated.

e. <u>Unfounded claims for punitive and noneconomic damages</u>

Plaintiffs claim punitive and noneconomic damages. Record Document 15-2, p. 10. Plaintiffs state that punitive damages are available under some Texas law but provide no legal reason that Texas law should apply or why that particular Texas law is applicable to the facts of this case. *Id.* The brief provides no basis in law for the award of noneconomic damages, nor does it provide a basis in fact for the measure of noneconomic damages. As to the measure for punitive damages, the only explanation given is by Plaintiff Doug Crain, who states without explanation in his affidavit that he should be awarded five times the sum of the following: the original amount paid to Defendants ($28,500) and the amount of "expected returns" ($67,260). This totals $478,800 in punitive damages. Record Document 15-3, ¶ 119. The Court cannot grant an unsupported request for punitive damages.

f. <u>No legal basis for recovery</u>

Because the legal basis for Plaintiffs' recovery is not clear, the Court cannot grant Plaintiffs' motion for default judgment. *See Nishimatsu Constr.*, 515 F.2d at 1206 (stating

that there must be a sufficient basis in the pleadings for a default judgment to be entered, even if the defendant has defaulted). The Court is not obligated to read all the uncited materials submitted on a motion for default judgment and then make its best guess as to what Plaintiffs' appropriate cause of action is. The Court is unwilling to assume the role of advocate for Plaintiffs. In addition to the possible causes of action that the Court has identified, Plaintiffs' brief contains disjointed references to several other possible causes of action under various security laws--both state and federal--and other state laws but does not specify why the law cited is applicable to the facts of this case. Here again, Plaintiffs force the Court to do their work for them. Indeed, the Court suspects that the brief Plaintiffs filed is a "cut and paste" job, composed from other briefs that Plaintiffs' counsel may have submitted in other cases. This suspicion is borne out by the brief's use of names of parties who do not appear in this suit. For example, in discussing whether exemplary damages are recoverable under Texas state law, the Plaintiffs' brief refers to acts of fraud by someone named "Rhee" against presumable plaintiffs named "Wu." Record Document 15-2, p. 25. Clearly, these parties' names were mistakenly included in Plaintiffs' brief.

The Court is sympathetic that this is a motion for default judgment. Certainly, the Plaintiffs were treated shabbily by Defendants. However, the Court is unable to determine liability or the nature and extent of Plaintiffs' damages and against whom they should be awarded without a minimum of the above information. Plaintiffs' motion for default judgment is hereby **DENIED**. Plaintiffs may re-urge this motion by submitting additional evidence and more convincing briefing by **Monday, April 1, 2019**. The failure to re-

urge the motion by that deadline will result in the dismissal of the case. No attachment that is not specifically referenced by page number by Plaintiff's counsel in his motion or memorandum will be considered by the Court.

## CONCLUSION

For the forgoing reasons, **IT IS ORDERED** that Plaintiffs' Motion For Default Judgment [Record Document 15] is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs have until **Monday, April 1, 2019**, to re-urge this motion after amending it to include additional evidence.

**THUS DONE AND SIGNED** in Shreveport, Louisiana, on this 12th day of February, 2019.

ELIZABETH ERNY FOOTE
UNITED STATES DISTRICT JUDGE